Good morning, Your Honors. We'll let counsel get ready. Go ahead. Good morning, Your Honors. Good morning. Please the Court. Christopher Bryan, representing the Corporate Petitioner of the Perfectly Fresh Entities, as well as Individual Petitioner, Jeffrey Long. Okay. With me at the counsel table is Barry Sexton, who represents the Individual Petitioner, Thomas Bennett. As you know, this case is a petition for review. Respondent, Department of Agricultural, determination that three entities violated the Perishable Agricultural Commodities Act by failing to make full prompt payment for various purchases of agricultural commodities. And its determination that two individuals are responsibly connected to two subsidiary entities. The Court issued a decision last week directing parties to address several issues, and each of us has filed a letter brief regarding those issues. Essentially, the briefs really didn't talk about the level of deference according to the agency. Both sides now seem to agree that chevron deference is applicable, so I'm not sure there's too much more to be said about that. Okay. Very good, Your Honor. Turning then to the brief filed in this Court, what petitioners are struggling with, and what this Court has struggled with in its previous Farley decision and in the Maldonado decision, is the extent to which individual liability can trickle down from the CEO, the CFO, and those who unambiguously control the business to individuals further down the hierarchy, such as sales manager or salesman, who are not necessarily involved in the decisions that led to the business's failure and the business's failure to pay produce creditors. What's at issue here are the tests to be applied to these individuals further down the corporate hierarchy. Can I just add, this seems to be a small operation. You have Tice, who organizes it, and then you have Duncan and Bennett, who come in, who are experienced. Both of them experienced, are they not? And Duncan, who has the cruise line. As far as... I'll have to admit, this is a whole new area to me. I've never encountered one of these cases. I've dealt with agricultural co-ops and produce in my other life, so I have some sense of how at least the fruit business works. I'm trying to figure out how these guys... I never heard of this act. So I'm trying to envision what the roles of stripping aside the corporate structure. Duncan seems to have come, just to pick him as the example, comes in. He's got a cruise line. Yes. Okay. He is selling produce to them. Yes. All right. And he has no connection whatsoever with turning around and arranging for the furnishing of the produce to the cruise line customers? I don't think he was directly involved with that. So your theory is he's just placing orders and therefore he doesn't qualify as a commission agent, he's not a broker. The only way they bring him into this mix is if he's responsibly involved in the billing and ordering process? Well, the real issue here is what led to the business's failure to make payments. In Maldonado, you had the CEO, Dirkscher, who basically embezzled money. Right. But the question is, PACA is set up to protect the vendors of the produce. Yes. Okay. So what I'm trying to understand and penetrate here, and I have to confess I have real trouble understanding some of the rationale of the judicial officer. But in any event, I'll save that for your opponent. But I'm just trying to understand where you see your clients, the two individuals, fitting into the structure. It does not seem to me that PACA could tolerate a situation where someone who is essentially acting like a broker, and I don't mean to be statutory, I'm just saying, acting like a broker. They go out, have the relationship with the cruise lines. He knows that he's got suppliers. In fact, I bet he has relationship with those suppliers because that's the way you get, presumably, get loyal customers of a cruise line. So to say that he isn't somehow involved in the supply and ordering and payment side of things, technically he may be only the salesman, but these guys seem to be more than just salesmen. They seem to be having roles in these ostensible corporations that elevated them to something more than just a mere employee salesman. So that's what I'm trying to wrestle with. Help me understand how you think they escaped the claws of PACA. Well, keep in mind here that the judicial officer found that neither of our clients, Mr. Bennett or Mr. Duffman, controlled any money. The monies were unilaterally controlled by CEO Tice and the CFO Revello, who hadn't contested their PACA liability. And they systematically ---- assumption about it is who were the checks from the customers written to? I assume they were written. There's a lot in the record about who the bought, that the buying went through marketing. But the selling, I think, went in the other direction, i.e. the checks went to the subs and then they turned over the money to marketing. Is that what happened? That's correct. The subsidiaries were set up to be sales entities. They were the ones that went out and developed relationships with the cruise lines or the direct store delivery for specialties. And my understanding, and I can find it somewhere in the record, is that those customers would pay the subsidiaries. The parent entity, marketing, would then transfer the monies from their bank accounts to its bank account. They all banked at Bank of America. And then it would, in turn, pay the creditors or make decisions about who to pay. But I think the record and the judicial officer found that all decisions regarding payments were done at the level of ---- But in terms of the permanent ---- That may be executing the checks. But in terms of all decisions, are you suggesting that it would be beyond the judicial officer's nature of their operation, that with these relationships, that they couldn't have turned around to Tice and said, look, you're compromising my relationship with my customers, and I'm part of your organization. I'm a responsible ---- You know, I'm not just some Joe you picked up off the street. You think that's not the kind of relationship that the PACA is looking for, for a person who's responsibly connected? I think what PACA is primarily focused on is the control. And I think the record is clear that Duncan, at one point, took an invoice that was unpaid and brought to his attention, and he took it to Ravello and said, look, handle this. What that tells me is he had no power. And keep in mind, the judicial officer also found that Duncan's operations with respect to consolidation were profitable and were used to subsidize ---- My understanding of the record is that the purchases were generated by the subs, i.e., they looked at what they needed and they said, we need, you know, 16 bananas for next week. And then they essentially went to some ---- you can tell me whether this is a correct understanding. Then they went to the ministerial people essentially at marketing and said, go buy six bananas. I need six bananas. But they were directing the purchases. One, and this is ---- Is that not true? Is that right? I don't think that's exactly right. One of the reasons that the entities were set up in this somewhat convoluted structure was so that they could enjoy economies of scale, so that marketing could make purchases, say, consolidation needed 60 cases. Well, of course. You have three subsidiaries. So one needs six bananas. The other needs 12 bananas. And the other one needs 18 bananas. So they add up all the bananas and they go buy that many bananas. But as to how many bananas each sub needs and when they need them and directing marketing to get them for them, that's being done by the subs. If you believe that a salesman being able to generate an order for 60 cases as opposed to 70 is somehow control, then, yes, I would have you ---- I'm not saying control. I'm just trying to get the facts straight. Okay. The facts is that the determination of how much to buy and when to buy it was being made in the subs. It's being made because the salesman is successfully generating sales. So as I said, if he's out there able to sell 2,000 bananas ---- But he's not simply then sitting around and waiting for someone to dump some bananas on him. He's then going out and arranging for the purchase of the bananas. I do not believe the record supports the assertion that he was actively involved in the purchase decision. I think he needed 60 cases of bananas. He put it in the computer system. But that went to an employee of marketing who made purchases for the consolidated entities. So to the extent you want to premise a finding ---- Well, made purchases in the sense of wrote the checks. But in terms of the key decision at any particular time, which is am I going to buy bananas this week, even though there may not be money to pay them, that was being made in the subs. I understand that they didn't necessarily know whether there was money to pay them because they didn't perhaps bother to find out. But in terms of making the decisions about how many bananas I'm buying this week, that was being made in the subs. Is that basically right? It was necessarily following from the sales. But it wasn't just, you know, flowing. It was there were decisions being made and transmitted. Get the X number of bananas. But I think that is flowing. And the fear here, or what the Court might appreciate, that the risk is that if you're going to expand patent liability out to individuals who are making sales that are, frankly, benefitting creditors ---- But wait a minute. I mean, there are other things to talk about with regard to the J.O. decision and what standards he was applying and so on, and we can get to that. But it's not helpful to be, you know, sloughing over the facts. And it isn't only because they're making sales. I mean, they are making sales and making discreet and specific decisions about purchasing, as I understand it. And you're not denying that. You're just characterizing it as still being sales. Well, frankly, I think the characters ---- I think a lot of this boils down to the characters. Did they decide where to buy things? Did they have anything to say about where to get the bananas? That I don't know. That's kind of critical because when you're dealing with, I mean, both for purposes of the statute and also, you'd think, in terms of sales, if you want to sell good bananas, if you want to have a good relationship with your customers, you have to make sure they're good bananas. I would think it would be reasonable to conclude that there were preferential relationships with certain suppliers. So that, yes, it would be buy from Dole or Chiquita or whomever. I know Mr. Sexton has a few issues, and I'm down to about three minutes. I think it's fair for me to allow him to speak unless there's another question. Thank you. Thank you, Your Honors. The please of the Court, Barrett, Sexton, and Paul are local PC on behalf of Petitioner Thomas Bennett and Petitioner Annapollo Thomas Bennett. It would be helpful to me if you could tell me in a couple sentences exactly as a legal matter you see wrong with the judicial officer's decision. I mean, what legal mistakes did he make? I think the primary legal mistake that the judicial officer makes is applying a test to Mr. Bennett that was applied in Maldonado, which is, did Mr. Bennett fail to act or counteract the misdeeds of others or obviate the misdeeds of others? This Court specifically criticized that test in Maldonado. The judicial officer uses it in two places. Uses it to determine that Mr. Bennett was actively involved in the misdeeds that resulted in the violation of the PACA because he failed to stop the salespeople from purchasing after he learned that they had purchased. And then he uses it also to say it shows that he was, in fact, not a nominal president but an actual president. But if you look at the facts, as soon as Mr. Bennett learned that his purveyors were not being paid, he went to Mr. Tice and Mr. Rovello, inquired about the nonpayment, was told that accounts receivables were going to catch up with payables. Mr. Bennett waited for a week to see whether or not that happened, and within two weeks he went back and said, I cannot draw a salary while purveyors are not being paid, and he quit. So he took the one power, the one action that he had, which was to quit. He didn't have the authority. Giving him the investment, the title of president, does not give him the power of president. He did not have the power to stop the proceedings of purchasing. He didn't have the power to have Mr. Rovello or Mr. Tice actually pay the purveyors. All he could do was suggest to his salespeople that they no longer purchased goods, and then he left. That was his parting statement to his purveyors. I'm going to leave. I think this is wrong. I don't think you should continue to purchase. But he didn't have the power to instruct them not to. He didn't have that authority over them. And I think using that test. Who are you referring to as the purveyors, the people that the produce was coming from? I'm sorry. I didn't hear the question. The purveyors that you're referring to are the people that the produce was coming  Yes. So you would agree that he had direct determination about where things were being purchased from them. He didn't have authority to stop the purchasing, though. For instance, in the case of the Hawaiian papaya, he thought that that was causing problems with the payables of Hawaii, of Perfectly Fresh Farms. And he tried to stop purchasing from Hawaii papaya, but Mr. Tice countermanded that and said, no, we're going to continue to do business with them. All he did was manage the sales staff. He didn't have the power to tell the sales staff to stop buying produce. But the sales staff that he managed did buy produce. That is correct. They didn't write the checks, but they made the decisions. That is correct. The record is actually contradictory on this. Mr. Tice testified that all the decisions of purchasing were made at the marketing level, that is, in the entity Perfectly Fresh Marketing. That can't be right. But Mr. Bennett testified that his sales staff made purchases. So I think that it is clear that his sales staff did make purchases. You say he couldn't even stop his own sales staff from purchasing. He could not stop them. All he could do is do what he did, which is to say, I'm no longer going to draw a salary while the purveyors are not being paid. He did that within two weeks. He got the news that they were not being paid at the end of December, and the evidence is uncontradicted that by the first week of January, by the end of the first week of January, he had resigned his position and refused to take wages. That is exactly the only thing he could do. And so I think it's interesting that the J.O. continues to use the did he fail to take action to counteract the failures of others or the misdeeds of others. Are you not talking about the actively involved firm? Well, the J.O. uses that test in both the active involvement and in the nominal portion of the test. And I wouldn't want my time to elapse without mentioning here that we do have the problem also of Mr. Bennett not having purchased his shares with cash. He was given it as a he was told he was going to be given 10 percent for being president, which means it was future consideration, which is not lawful under California law. Therefore, he did not quote lawful shares. And both the J.O.'s decision and the chief administrative law judge's decision makes it clear that perfectly fresh farms and perfectly fresh facilities were alter egos of perfectly fresh marketing. Thank you. Thank you. We'll hear from the Agricultural Department. May it please the Court, my name is Leslie Lagomarsino. I represent the Secretary of Agriculture in these proceedings. There is substantial evidence in the record that supports the Secretary's determination in these cases that each of the three subsidiary corporations was purchasing produce that was not paid for, and therefore, they were each in violation of the prompt payment provisions of the PACA. Well, Polly, I couldn't really understand in the record from the opinion what the I mean, in some long-range sense, yes, they were purchasing things, and eventually those weren't paid for. But does it matter that they weren't the ones not doing the paying? Are you speaking in terms of the responsibly connected issues? Yes. The actively involved in the activities that leading to the transactions resulting in the violations could include purchasing produce. Even if you have nothing to do with paying for it? Even if you don't have anything to do with paying for it. The judicial officer has held that buying produce when that produce is during the period of violations, if you're purchasing produce, then that's sufficient. And where do you know that? In this opinion, you mean? Well, in this opinion, there were other factors in addition to the fact that both Mr. Bennett and Mr. Duncan were purchasing produce, but he also So what's the answer? That is not set forth in this opinion? It's in some other source? It is one of the factors in this opinion, yes. The purchasing alone is actively involved? That wasn't the only factor. So no, it was not in this opinion. Please. I'm sorry. I understand there's a lot of issues in cases. I'm trying to just answer the question. The reason we ask questions is because we don't quite understand. Okay, so I'm just trying to understand. The JO opinion relies in part on actively involved, which involves purchasing, correct? That's right. Okay, and purchasing from whom? In this case. In this case, purchasing from the suppliers who were not paid. Okay, and there is evidence that Bennett and Duncan purchased directly, got their fruit from the vendors, or got their produce from vendors? Yes, Your Honor. There is evidence that Mr. Duncan had relationships with suppliers, that he spoke with them on a daily basis, he checked with them about the price and availability of produce, and that he arranged for the orders to be processed through the computer system to effectuate the sale. Okay, so it would be enough under the precedent of the judicial officer that if all there was was that kind of activity, where the person who has got the client relations with the cruise ships or the wholesalers or whatever is taking their orders and then turns around and arranges for the various vendors to fill those orders. That would be enough for responsibly connected to kind of authority. Is that it? That's right. Even if those people had no idea what the finances were and had every reason to think that people were going to get paid. They were in no sense responsible for them not getting paid for the produce. Well, that's right. Because they are an officer or a director of the cruise ship. That's a different question, but I'm trying to get to the actively involved part. In other words, it is sufficient active involvement resulting in the violation, even if there's no connection to the nonpayment. Yes, Your Honor. What about their customers? What about the cruise lines? Would they also therefore be actively involved? Would the cruise lines be actively involved? Yes, they're also. They're purchasing the same produce. No, they're not. They would not. I know, but what about the actively involved part? I'm afraid I don't understand, Your Honor. Well, these people are representing that they were making purchase. They were directly purchasing, but they had no role in paying for them, right? Now, their customers were also purchasing produce. The cruise lines were purchasing produce, the same produce, which eventually wasn't getting paid for. So why isn't the cruise line just as actively involved as the subs are? Well, the cruise lines were paying for the produce. I understand that, but these people, this is their representation, that the two functions were split up in the company. Making decisions about what was going to be bought and paying for it was split up. So if that's the case, then if their problem is the making decisions to buy something, not the not paying for it, then their customers would be in the same position because they're also buying the same produce, which eventually isn't getting paid for. Well, I guess if that would be true, if the cruise lines were paying for it. All right. So what is the J.O. standard for this, then? How is he connecting up? What legal standard is he applying to connect up the activity and the resulting of the violation of the nonpayment? At one point he says buying or selling is enough. Selling certainly can't be enough because if you just sell something, I'm going to assume selling can't be enough. Well, if you're selling produce that hasn't been paid for. So are what you're saying, first of all, can I take one step back just to clarify? What you have described, purchasing and doing all of that, seems to be a definition of a broker. These two individuals are not charged as brokers, is that right? They're not brokers? They were not charged as brokers, no. Because they would have to be licensed brokers to come within PACA, is that it? In other words, you reach them because the way you get to them is that they're employees of a licensee, but although they themselves aren't licensed, they are responsibly connected. The PACA reaches them because they are officers and directors of the corporation. That's enough. That's right. Unless they can show that they weren't actively involved or they were not. Okay. So because they have that status in the corporation, the statute says they are responsibly connected unless they can show by a preponderance of the evidence that they were not actively involved in the transactions leading to the violation. And they have to also meet the second prong. They also have to show that they are nominal. Nominal. Okay. So the actively involved part of this analysis, you're saying even if they didn't turn around and deal with the vendors, as long as they went out and were active in securing the orders from the cruise ships and others, that would be enough for actively involved? That's right. They were selling produce that hadn't been paid for. Okay. And that distinguishes them from just a normal employee salesperson because they are officers of the corporation. That's right. All right. And as officers of the corporation, they are actively involved. And they should know that there's not enough money around to pay for this produce. As the status of officer would suggest that they would know. However, that is only one of the factors that the judicial process applies. Can I ask you a question? Have you ever diagrammed this case? No, I haven't. It probably would have been a good idea. Well, I think it's a good idea to diagram every case. It is hard to figure out. I mean, the other piece of this is apparently one of these subs, I forget which, was quite profitable. And in terms of whether it would have had the money to pay if it were on its own, it would have and presumably would have paid. Does that make any difference in terms of the control of the officer of that company over the ability to pay? I mean, I gather if he were operating on his own, everybody would have been paid. But he didn't seem to have that control over his own finances. Does that make a difference? Well, that would be Mr. Bennett, who was one of the founders of the corporation and actually was one of the architects of this corporate scheme whereby they agreed that they would funnel all of the receipts through the subsidiaries to marketing. He agreed to that scheme. So the money, although the corporation was profitable, he wasn't using that money to pay for the produce. All right. Now, let's assume his facts, which I understand are this. I learned they weren't paying. I went to someone and said, we can't have this. You have to pay. And when I learned they weren't, I quit. All right. And his representation is there's nothing else he could have done because he actually had no authority to make them pay. Now, why wasn't that good enough that he was not, in fact, A, he was nominal in the way that mattered, i.e., he didn't seem to be able to affect the payment? And, B, in terms of whether his active involvement resulted in the violation, he got out as soon as he could in terms of not having that impact. If you accept the facts as Mr. Bennett has portrayed them, then he would be not actively involved. If he claims that he actually did not have any authority over his sales staff, that he was hired to manage on a day-to-day basis. Well, I don't think anything in the J.O. opinion contradicts it. It just seems to say it doesn't matter. You think that the J.O. did not agree with that representation as opposed to say that that doesn't? I mean, the J.O. said that buying and selling is sufficient involvement. He seemed to say that having a connection to the ability to pay didn't matter. Right. For the active involvement problem, that's right. Right. And for the nominal part, too. I mean, he says the guy is an officer. He's a part owner. He had something to do with his setting up of the scheme. But he doesn't seem to say he, in fact, had any ability to make anybody pay anybody. Well, he did have the ability to manage his sales staff and to prevent the sales staff from continuing to purchase produce and run up the debt of the corporation. Well, his representation is no. Did the J.O. find otherwise on that? I believe that the J.O. did find that he was his responsibilities, including the day-to-day management of the sales staff. Meaning that he could have told them to stop buying. I don't recall if the J.O. used that specific word. I don't think he made such a finding. Because he was operating at a higher level of generality. He seemed to think that the statutory standards were at a higher level of generality, that they didn't have to be tied into the particular circumstances that led to the particular  And that seems like to be the ultimate question, really. How close in does the activity of these individuals need to be to what actually happened on the ground? The judicial officer has said that you need to have the ability to affect the policy or the business, the day-to-day business of the company. That doesn't necessarily mean that you have to control the sales staff. Well, you have to. I mean, he clearly had the ability to affect some things, i.e., the selling to the customers and the determinations of what to buy. But is that enough, or does it have to be an ability to affect the payment? Because it's the payment that's at issue here. That it would be enough to affect the day-to-day operations of the business. Because it was the day-to-day operations of the business that was leading to the creation of the debt. So he does not have to have the ability to write checks or to make the payment. What about to make decisions about whether payments are going to be made? I don't think that would be required. So that's the bottom line. It doesn't matter whether these people have any ability to affect the actual payment to the sellers, to the proto-sellers. I think that that's right. Although that's not represented in the record here, there is testimony from one of Mr. Duncan's buyers that he dealt with Mr. Duncan on a daily basis and that Mr. Duncan took care of him by going to Mr. Tice and putting pressure on Mr. Tice to make payments to this particular seller. So in that way, although Mr. Duncan claims he doesn't have the authority to actually write the check, he did have the power to go to Mr. Tice. You're minimizing the record, I think, to say writing checks, which is a ministerial task. Make the decision whether to write the checks, which is somewhat different. You do not need to have the power and authority to make the decision to write the check to be a non-nominal officer. Triple negative there. We've got the point. So what's the purpose of this statute? The statute is a very harsh statute and it has harsh results, but the purpose of the statute is to protect the produce sellers who are in the business of dealing with perishable commodities so that they ship off their strawberries and their strawberries deteriorate over time. So the statute, Congress is a highly regulated industry, and Congress stepped in with a harsh statute to assure that corporations that are not able to make good on their obligations to their produce sellers are sanctioned. They're also focused on the perishable nature of the product. That's right. Prices vary and whatever. Now, we haven't talked at all about the viability of the subs themselves, but I gather it ties in because if the subs are liable, then the individuals aren't. That's right. That's the only reason it ties in. That's right. Once the corporations are found to have violated the PACA, then the officers and directors of those organizations are subject to the employment restrictions of the PACA. Could you briefly comment on this question of how, whether the bankruptcy schedules were preclusive as to the assets or the role of the subs? I mean, you rely on the bankruptcy schedules as demonstrating that these were in fact, that the various debts were the responsibility of the subs. Their argument is not necessarily. We could be essentially down the line. I think what they're saying, it's a little hard for me to understand, but it's something to the effect of because of the PACA trust concept, we could be holders of the assets. That's what I understand them to be saying. I think I hear two questions in there. Are the bankruptcy petitions preclusive? Well, the bankruptcy petitions are certainly preclusive, or at least evidence as to whatever they're evidence of, and that's why I didn't find your briefs helpful on this subject, because you kept demonstrating that you could rely on the bankruptcy records. I'm sure you can, but the question is what do they mean? The judicial officer said they are an admission of the produce. That's what I'm asking you, but that's the question. Are they? They are. Why? Their argument is that they, as best I understand it, is that the bankrupt beneficiaries have a claim against their property. They have a claim against the PACA trust. But the PACA establishes, in order to protect the suppliers, the PACA requires that all receipts from purchase and sale of produce is held in trust, and what the trust does is essentially give the PACA suppliers a first interest ahead of any other claimants in the bankruptcy proceeding. So the only way that you would have a claim against the PACA trust is if you had a claim against the debt for the sale for unpaid produce. Well, I don't know. If, for example, it was marketing that incurred the debt, but then provided the produce to the subs, as I understand it, the PACA trust follows the produce. So if the subs have the produce, they are, if it's sitting in their coolers, then they are subject to the PACA trust, and it would be their property that would be responsible for it, even if they didn't incur the debt in the first place. Well, in this case, the cruise line, for example, was the purchaser of the produce paid the sub. Those receipts that were received by the sub are the PACA, go into the PACA trust. Okay. So when the purchaser, or the seller, I'm sorry, the seller of the produce, the sale has gone through marketing, when that seller doesn't get paid, that seller has a first priority in the receipts that were created by virtue of the PACA. Whether or not they had a direct relationship with the subs. That's right. That's right. So it's their proof. So it's not proof, therefore, that the sellers are their creditors. It's only a proof that, except in the sense that they have a PACA trust relationship. Well, I think that would be... Well, that's their argument. Their argument is that it can't be taken to be a demonstration that we, in fact, bought this produce, and are direct creditors. The most it can be is because we eventually sold it, and we got the proceeds. Our property may be subject to the PACA trust, but we were not the creditors. Necessarily. And you seem to have now demonstrated that that's true. I think that maybe that is true. To be honest with you, I didn't understand their argument as clearly as you just articulated it. That's why you need a diagram. No, really. One of your jobs is to make our lives a little easier. We have like 32 tough cases this week. And it's helpful if counsel presents their position to us so that it's clear and concise. And it's easy to understand. You can just follow it. Like say you were a reporter for the New York Times, and you were going to write up this case. You'd want to write it up so that the average person that buys the New York Times or subscribes to its websites can read it and understand it. You might try USA Today, actually. Stay away from that. I mean, the farmer got paid, right? The farmer gets paid? No. He's got to pay 50 cents in a dollar in the long run. Well, no, the farmer gives the money. Tell me how it works. I'm a farmer. I have my own little farm, too, but it's under the state Congress. But I'm a farmer, and I grow bananas. So what happens then? What do I do? How do I market my bananas? Well, you would form a relationship with someone like Mr. Duncan, who has a relationship with... Well, don't tell me about Duncan. Just tell me how I do it. You would find a buyer for your bananas by finding someone who has relationships with purchasers, supermarkets, restaurants... Middlemen. Middlemen. Okay. And does the middleman pay me when I give him the bananas, or do I have to wait? The middleman pays you. And when the middleman doesn't pay you... What? The middleman pays you. Yeah. Yes. And if he doesn't, the PACA protects you by giving you a trust interest in the proceeds that he receives when he sells it to the supermarket. And it also protects you by disciplining the middleman and taking away his license... So you're saying then, I have my bananas, you know, there they are in the tree, and I turn them over to the middleman, but he doesn't pay me? He does pay you. Okay, so if he pays me, what do I care what he does with them? It's when he doesn't pay you. Well, I mean, when you deliver the bananas, does he pay you? He should, yes. Huh? Yes. He should pay you. And when he doesn't pay you... Right then and there. Here are my bananas. Give me the money first. The PACA says that he has to pay you promptly and fully, and that means within 10 days, unless you and he agree to a different time scheme. But he has 10 days to pay you, and if he does not pay you within 10 days, he is in violation of the prompt payment provisions of the PACA. And he can lose his license to do business with farmers such as himself. Okay. So how does the banana get to the cruise line? The middleman would deliver the bananas to the cruise line. The middleman delivers them to the cruise line. Right. So what do we need all these other people then? Is that another middleman? There are several middlemen involved in these proceedings. It's called capitalism. I'll explain it to you. Well, I know. It's complicated. And so in the end, the farmer doesn't get his money, and the guys that run around with all of this and sell bananas to ships, what you do with them is you say you can't be in this business for a couple of years. We're punishing you. Is that the way it works? That's the way it works. The license is revoked. Yeah. And the responsibly connected officers and directors of the corporation that operates as the middleman. By the way, it's now many years later. In the meanwhile, what's happening? Are these people operating in the industry now? In other words, is this all until there's a final order they operate? That's right. The general officer's state is ordered in this case until the resolution of these proceedings. And this only goes to these two people. What happened? Is the record showing anything about Tice? Tice did not dispute his responsibly connected status. Okay. So what happened here? He was out of business? He's subject to the package of employment restrictions, yes. For a period that's probably long over by now. Right. It's a two-year period. Okay. All right. Thanks. Hello. Should I continue to eat bananas? You should continue to. Okay. How about it? Yeah. Thank you. All right. Is there time remaining? What? Is there time remaining? You're supposed to keep track of it. Just like you're supposed to keep track of the money. Pay the people on time. Thank you. Well, I would like to address one issue, which was mentioned by counsel to the USDA, which is that under the Norenberg's decision, which the J.O. issued after the 1995 amendments, a petitioner has to be actively involved. And under Norenberg, the J.O. said that means actively participate in the wrongdoing that constitutes a violation of the packet. The wrongdoing that constituted a violation of the packet here was the failure to pay the purveyors. It was not the ordering of new goods. Ordering goods alone is not a violation. Ordering goods that the company doesn't have money to pay for. Yes, but the company may have money to pay for it. At the time that the order is placed, a salesman who may both sell and also purchase goods wouldn't know, if he's not in a position to know whether or not our goods are being paid for, it's not merely selling. That was the whole purpose of the 1995 amendment to packet. As counsel heard the USDA mention, it is a very harsh statute. It was even harsher before 1995. But the trouble is, I mean, all of these rules have to be thought through with regard to the incentives they create. And obviously, the incentive that your interpretation would create would be to keep all the financial information about the company very closely held so that all the people who are incurring debt can have deniability in terms of knowing whether the debt's going to be paid for. But the 1995 amendment does presume that there are circumstances where somebody would have deniability. Well, somebody. I mean, here, you know, here you have a chief financial officer, but just one person. You're saying that all the people who are running around ignorant of the finance. There's an incentive to set up a structure where the people who are incurring the debt do not have knowledge of the company's ability to pay. You might want the opposite. You might want to make sure that the people who are incurring the debt do have knowledge of the company's ability to pay before they incur the debt. And so you create an incentive for them to find out by saying it's not going to do you any good not to know. So you may as well find out. Actually, I think in the scheme of things, Your Honor, I think most of the people who at the unit level do incur the debt are immune from the path of censure. Well, I know. But we have these higher-up people who are claiming or who are supervising the incurring of the debt and at the same time are claiming that they don't have sufficient knowledge or control over the finances to do anything about the fact that it can't be paid for. And that is correct. And that has been the inquiry. Does Mr. Bennett, does Mr. Duncan, do they really have the ability to stop the debt? But the legal question is, I don't know if they have, but could they if they did it properly? Could the judicial officer have a standard that taking account of these incentives says incurring a debt without knowing whether it can be paid for is doing something that's resulting in a violation and that's enough? I think the judicial officer could make a determination that if what you did was intentionally create the kind of scheme that you just described, that is an organization where you are going to willfully... That's essentially what he found here, isn't it? No, it really isn't. In fact, it's the officer. What happened was he just created sales entities. And it was Mr. Duncan, who, by the way... But wait a minute. But that's going back to this issue that we went over before. They weren't just sailors. They were making specific, discreet decisions about buying produce as they had to... That's correct. ...in order to be effective sellers. Otherwise, they didn't know what to buy from them. That is correct. So to keep calling them just sellers is not accurate. Well, excuse me, Your Honor. When I say sales entity, I mean that they were also involved in the purchasing of the product. So purchasing and sales entities. But they didn't have the authority to stop the purchasing. I believe it's on page 1061 of the transcripts, where Mr. Bennett specifically says he wanted to stop the business with Hawaiian papaya. But Mr. Kai specifically prevented him from doing so. The ultimate authority wasn't with these sales people to stop purchasing or to stop dealing with purveyors, the banana farmers who weren't being paid. I did want to just correct one matter for the record, though. It was Mr. Duncan who ran the profitable... I didn't say which one. It wasn't his name. Okay. Thank you. Thank you, Your Honor. Thank you. Do you want to say something, too? All right. See you later.
judges: Pregerson, Fisher, Berzon